**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-01784-STV

B.E.,[1]

      Plaintiff,

v.

LELAND DUDEK,[2] Acting Commissioner of Social Security,

      Defendant.

_____

**ORDER**
_____

Chief Magistrate Judge Scott T. Varholak

      This matter is before the Court on Plaintiff B.E.'s Complaint seeking review of the Commissioner of Social Security's decision denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 401 *et seq*., and 1381-83c, respectively. [#1] The parties have both consented to proceed before this Court for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 72.2. [#16] The Court has jurisdiction to review the Commissioner's

---

[1] Pursuant to D.C.COLO.LAPR 5.2(b), "[a]n order resolving a social security appeal on the merits shall identify the plaintiff by initials only."

[2] Martin O'Malley is the named Defendant in the Complaint as he was the Commissioner of Social Security at the time the Complaint was filed. [#1] Leland Dudek currently serves as the Acting Commissioner of Social Security. https://www.ssa.gov/agency/commissioner (last accessed April 16, 2025). Pursuant to Federal Rule of Civil Procedure 25(d), Leland Dudek, as Commissioner O'Malley's successor, "is automatically substituted as a party." *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  This Court has carefully considered the Complaint [#1], the Social Security Administrative Record [#10], the parties' briefing [##11, 12, 13], and the applicable case law, and has determined that oral argument would not materially assist in the disposition of this appeal.  For the following reasons, the Court **REVERSES** the Commissioner's decision and **REMANDS** this matter for further proceedings consistent with this Order.

I.    **LEGAL STANDARD**

A.    **Five-Step Process for Determining Disability**

The Social Security Act defines disability as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[3]  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  "This twelve-month duration requirement applies to the claimant's inability to engage in any substantial gainful activity, and not just his underlying impairment."  *Lax*, 489 F.3d at 1084.  "In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility . . ., the Commissioner [ ] shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

---

[3] "Substantial gainful activity" is defined in the regulations as "work that (a) [i]nvolves doing significant and productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910; *see also* 20 C.F.R. §§ 404.1572, 416.972.

"The Commissioner is required to follow a five-step sequential evaluation process to determine whether a claimant is disabled."  *Hackett v. Barnhart*, 395 F.3d 1168, 1171 (10th Cir. 2005).  The five-step inquiry is as follows:

1. The Commissioner first determines whether the claimant's work activity, if any, constitutes substantial gainful activity;

2. If not, the Commissioner then considers the medical severity of the claimant's mental and physical impairments to determine whether any impairment or combination of impairments is "severe;"[4]

3. If so, the Commissioner then must consider whether any of the severe impairment(s) meet or exceed a listed impairment in the appendix of the regulations;

4. If not, the Commissioner next must determine whether the claimant's residual functional capacity ("RFC")—*i.e.*, the functional capacity the claimant retains despite his impairments—is sufficient to allow the claimant to perform his past relevant work, if any;

5. If not, the Commissioner finally must determine whether the claimant's RFC, age, education and work experience are sufficient to permit the claimant to perform other work in the national economy.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005); *Bailey v. Berryhill*, 250 F. Supp. 3d 782, 784 (D. Colo. 2017).  The claimant bears the burden of establishing a prima facie case of disability at steps one through four, after which the burden shifts to the Commissioner at step five to show that the claimant retains the ability to perform work in the national economy.  *Wells v. Colvin*, 727 F.3d 1061, 1064 n.1 (10th Cir. 2013); *Lax*, 489 F.3d at 1084.  "A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Ryan v. Colvin*, 214 F. Supp. 3d 1015, 1018 (D. Colo.

---

[4] The regulations define severe impairment as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).

2016) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991)).

**B.    Standard of Review**

In reviewing the Commissioner's decision, the Court's review is limited to a determination of "whether the Commissioner applied the correct legal standards and whether her factual findings are supported by substantial evidence." *Vallejo v. Berryhill*, 849 F.3d 951, 954 (10th Cir. 2017) (citing *Nguyen v. Shalala*, 43 F.3d 1400, 1402 (10th Cir. 1994)). "With regard to the law, reversal may be appropriate when [the Commissioner] either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards." *Bailey*, 250 F. Supp. 3d at 785 (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (quotation omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id*. at 103. Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). "It requires more than a scintilla, but less than a preponderance." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax*, 489 F.3d at 1084). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Grogan*, 399 F.3d at 1261-62 (quoting *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992)). The Court must "meticulously examine the record as a whole, including anything that may

undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met.'" *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007) (quotation omitted).  The Court, however, "will not reweigh the evidence or substitute [its] judgment for the Commissioner's."  *Hackett*, 395 F.3d at 1172.

## II.    BACKGROUND

Plaintiff was born in 1962.  [AR 625][5]  He is a college graduate.  [AR 652, 740] Plaintiff is able to communicate in English.  [AR 650]  On March 1, 2022, Plaintiff filed a Title II application for DIB and a Title XVI application for SSI.  [AR 602, 623]  In both applications, Plaintiff claimed a disability onset date of January 1, 2014, and thus was 51 years old at the time of the alleged onset.  [AR 603, 623]  Plaintiff claims disability based upon mental impairments, including postencephalitic neuropsychiatric disorder, panic disorder, anxiety disorder, bipolar disorder, and major depressive disorder.  [AR 603, 651]  Plaintiff has worked as an office worker in a medical office and, most recently, as a retail associate in an office supply store.  [AR 652]  Plaintiff's last employment was in January 2014.  [*Id.*]

### A.    Medical Background[6]

Plaintiff has a history of mental health problems.  On March 25, 2001, Plaintiff was admitted to the hospital after experiencing delusions and hallucinations as well as symptoms of catatonia and bizarre movements.  [AR 739-42, 770-76, 798-807]  Medical records from this hospitalization indicate that Plaintiff had a history of anxiety disorder

---

[5]  All references to "AR" refer to the sequentially numbered Social Security Administrative Record filed in this case.  [#10]
[6] Because Plaintiff claims disability based upon psychological and cognitive issues and his challenge to the ALJ's decision focuses on the ALJ's evaluation of these mental impairments, the Court's analysis of Plaintiff's medical background likewise focuses on Plaintiff's psychological and cognitive difficulties.

that lasted for eighteen months and that Plaintiff had also been treated for mild depression and a history of obsessional personality traits. [AR 739] Plaintiff had been on Prozac for approximately six months but one week before his hospital admission had abruptly discontinued the medication because he felt the Prozac had contributed to his flu-like illness. [AR 739, 772] A brain MRI revealed a left medial temporal lobe prominent sulci and Plaintiff appears to have been diagnosed with viral encephalitis. [AR 743, 884, 1012]

After the first few days of admission, Plaintiff's mental state deteriorated and he experienced periods of insomnia. [AR 741] By April 5, however, Plaintiff's mental status had improved dramatically and he no longer displayed the symptoms of catatonia and bizarre movements. [*Id.*] Plaintiff was discharged on April 9 and was instructed to remain on Seroquel for six months.[7] [*Id.*]

There are very few medical records between 2001 and 2015. In December 2015 Plaintiff began participating in psychological treatment sessions. [AR 892-1004] During a December 1, 2015 visit, Plaintiff explained that he had not experienced any mental health problems until his viral encephalitis diagnosis. [AR 1002] After that, Plaintiff began experiencing insomnia, extreme anxiety, and panic attacks. [*Id.*] Plaintiff said that the medications helped with the anxiety and panic attacks but had never made them go away. [*Id.*] During the treatment session, Plaintiff described his mood as "OK." [AR 1003] His attention, concentration, and short-term memory were listed as "impaired" and his thought process was described as "tangential at times." [*Id.*]

---

[7] After this incident, Plaintiff began experiencing seizures. [AR 884, 1012] A February 20, 2014 medical record indicates that Plaintiff experienced a seizure and fell, hitting his head on the floor. [AR 876, 882]

During a January 2016 treatment session, Plaintiff indicated that his mental status was largely unchanged. [AR 997] He said his mood was "OK" though anxiety remained his biggest complaint. [*Id.*] Plaintiff was described as "fully oriented" though his short-term memory, attention, and concentration were listed as "impaired" and his thought process was described as "repetitive, tangential at times."[8] [AR 998-99] Plaintiff's responses to a depression questionnaire suggested moderate depression. [AR 1000]

Plaintiff reported during a February 2016 treatment session that he continued to experience anxiety and was only getting 3-4 hours of sleep per night. [AR 990] Plaintiff's responses to a depression questionnaire suggested mild depression. [AR 993] During a March 3, 2016 treatment session, Plaintiff indicated that his sleep and anxiety seemed to be getting better though his responses to the depression questionnaire suggested moderately severe depression. [AR 985, 988] And during a treatment session later that month, Plaintiff indicated that he felt that the medications were helping with his anxiety and his responses suggested mild depression. [AR 980, 983]

During a May 3, 2016 treatment session, Plaintiff stated that he was "feeling pretty much back to normal even though [it had] been a stressful month." [AR 975] His responses to the depression questionnaire suggested either no depression or minimal depression. [AR 978] Plaintiff believed that gabapentin was helping him. [AR 975]

---

[8] Treatment records throughout 2016 and 2017 contain similar notations. [AR 893-94, 898-99, 903-04, 909-10, 914-15, 920-21, 926-27, 931-32, 936-37, 941-42, 946-47, 951-52, 956-57, 961-62, 966-67, 971-72, 976-77, 981-82, 986-87, 991-92] Beginning in April 2017 the notes also reflect impaired long-term memory. [AR 894, 899, 904, 910, 915, 921, 927, 932]

Plaintiff reported doing "OK" during a June 2, 2016 treatment session.  [AR 970] He said that his anxiety was at a good level in the morning but increased during the day until he could take his nighttime medications.  [*Id.*]  His questionnaire responses suggested mild depression.  [AR 973]  Notes from a treatment session from the end of the month reflect some family troubles though Plaintiff appeared to be handling those stressors appropriately.  [AR 965]  Plaintiff described his anxiety as "manageable."  [*Id.*] His responses to the depression questionnaire suggested either no depression or minimal depression.  [AR 968]

During a July 2016 treatment session, Plaintiff stated that he was sleeping "pretty well" and described his mood as "pretty good."  [AR 960-61]  His questionnaire responses suggested mild depression.  [AR 963]  In September, Plaintiff similarly stated that he had been doing "pretty well overall."  [AR 955]  He indicated that the flu had caused his anxiety to increase though the anxiety had come back down once the illness went away.  [*Id.*]  His questionnaire responses suggested mild depression.  [AR 958]

Plaintiff returned for a treatment session in December 2016.  [AR 950-54]  He stated that he was doing "OK" though the change in the weather had decreased Plaintiff's energy and he was not sleeping as well. [AR 950]  As a result, his anxiety had increased slightly.  [*Id.*]  His questionnaire responses suggested moderate depression. [AR 953]

During a February 2, 2017 treatment session, Plaintiff reported negative side effects from taking a generic Seroquel prescription.  [AR 945]  He said he went days without sleep and his anxiety skyrocketed.  [*Id.*]  He also reported experiencing panic attacks.  [*Id.*]  His questionnaire response suggested moderate depression.  [AR 948]

Plaintiff reported continued difficulty sleeping during a March 2, 2017 treatment session.  [AR 940]  He stated that he was unmotivated and his focus was worse.  [*Id.*] His questionnaire responses reflected moderately severe depression.  [AR 943]  During a March 21 treatment session, Plaintiff stated that he had been having nightmares and was sleepwalking.  [AR 935]  He said that his anxiety was getting worse, a feeling that was reflected in other medical records from that month.  [AR 827, 935]  His questionnaire responses reflected moderate depression.  [AR 938]

Notes from an April 11, 2017 treatment session reflect that Plaintiff was continuing to have difficulty sleeping and was sleepwalking, and was continuing to suffer from panic attacks.  [AR 930]  He reported that things had been "OK."  [*Id.*] Responses to his depression questionnaire suggested mild depression.  [AR 933] Plaintiff reported similar problems with sleeping and sleepwalking during a treatment session later that month.  [AR 925]

During a May 17, 2017 treatment session, Plaintiff reported being under a lot of stress.  [AR 919]  He stated that he was experiencing waves of depression, particularly at night.  [*Id.*]  He reported trouble sleeping and his medication compliance appeared erratic.  [*Id.*]  His questionnaire responses suggested moderately severe depression. [AR 922]

Plaintiff reported increased anxiety during a June 14, 2017 treatment session. [AR 913]  His panic attacks were frequent and he was having difficulty sleeping.  [*Id.*] His questionnaire responses indicated moderately severe depression.  [AR 916]  During a treatment session the following month, Plaintiff reported continued difficulty sleeping and his questionnaire responses again reflected moderately severe depression.  [AR

908, 911]  During a phone call after his July treatment session, Plaintiff reported anxiety and panic attacks.  [AR 907]

During an August 29, 2017 treatment session, Plaintiff reported constant anxiety. [AR 902]  He expressed stress over his finances, difficulty sleeping, and feelings of hopelessness.  [*Id.*]  Plaintiff's questionnaire responses reflected severe depression. [AR 905]  During an October 10 session, Plaintiff reported "a string of bad things happen[ned]."  [AR 897]  His anxiety levels remained the same and he reported continued panic attacks and difficulty sleeping.  [*Id.*]  His questionnaire suggested moderate depression.  [AR 900]  Records from a December 5 treatment session reflect a lack of improvement in Plaintiff's anxiety levels and continued panic attacks and difficulty sleeping.  [AR 892]  Nonetheless, Plaintiff reported an improvement in his mood, though his mood questionnaire still reflected moderately severe depression.  [AR 892, 895]

On February 28, 2019, Plaintiff underwent a psychiatric consultation due to a recent move to Colorado.  [AR 1060-64]  Plaintiff reported that his most serious symptoms were a perpetual state of anxiety and insomnia.  [AR 1060]  Plaintiff presented with clear speech and cognition, no signs of a thought disorder, but anxious mood and affect.  [*Id.*]  Plaintiff's memory and cognitive ability were intact.  [AR 1061] Medical records from April and May 2019, however, show that Plaintiff had been off his medications.  [AR 1054, 1057]  These records indicate that Plaintiff felt that he was non-functional and paralyzed by anxiety.  [*Id.*]  Plaintiff also stated that he was having sleeping problems.  [*Id.*]  Nonetheless, he appeared alert and oriented.  [*Id.*]

On July 19, 2019, Plaintiff reported to the emergency department stating that he had not slept for the past five days.  [AR 1028]  He indicated that he had been off his medications for a month due to financial circumstances.  [*Id*.]  On September 5, 2019, Plaintiff was taken to the emergency department as a result of an apparent accidental drug overdose.  [AR 1017-18]  A CT of the head was performed which was largely unremarkable.  [AR 1021]  At the time of the overdose, Plaintiff had been in a homeless shelter.  [AR 1017]

Medical records from late 2019 describe Plaintiff as alert and oriented, with appropriate mood and affect.  [AR 1040, 1045]  On December 26, 2019, Plaintiff underwent a consultation and administration of a Montreal Cognitive Assessment ("MoCA").  [AR 1037-38]  The MoCA indicated mild cognitive impairment.  [AR 1037]  Plaintiff's concentration and attention were good.  [AR 1038]  He endorsed anxiety and insomnia.  [AR 1037]

Medical records from early 2020 describe Plaintiff as alert and oriented, with appropriate mood and affect.  [AR 1032, 1035, 1304]  And on February 14, 2020, Plaintiff reported to a treating physician that he was feeling stable.  [AR 1031]  Medical records from July 20, 2020 likewise indicate that Plaintiff was coping well, though he was currently in a homeless shelter.  [AR 1297]  Plaintiff indicated that his anxiousness and depression, while significant, were well-managed by medications.  [*Id*.]  His depression screening questionnaire reflected moderate depression.  [AR 1298] On July 29, Plaintiff had a telehealth visit in which he indicated that he was doing well with his medications.  [AR 1291]

On September 22, 2020, Plaintiff reported to the emergency department complaining of anxiety. [AR 1328] Plaintiff was alert and oriented. [AR 1330] Plaintiff indicated that his primary care doctor was concerned that Plaintiff was addicted to and abusing his medications. [AR 1331] Medical notes from October indicate that Plaintiff was attempting to cut back on his clonazepam. [AR 1283, 1285, 1287] Notes from a December 9, 2020 appointment indicate that Plaintiff had stopped taking the drug for six weeks and that Plaintiff was having difficulty sleeping. [AR 1281] An MRI of the head from that date was unremarkable. [AR 1310] An EEG from December 14 was also largely unremarkable. [AR 1347-48] Notes from a December 23 consultation indicate that Plaintiff was on a lower dose of clonazepam and was feeling very anxious throughout the day. [AR 1279]

During an April 28, 2021 medical appointment, Plaintiff indicated that he cannot sleep well without Seroquel and that he was in a perpetual state of anxiety. [AR 1274] Records from a May 4 medical appointment, however, indicate that Plaintiff's anxiety was much better after resuming clonazepam. [AR 1271] He also indicated that he was sleeping well with Seroquel. [*Id.*] Records from both April and May state that Plaintiff was alert and oriented and his mood and affect were appropriate. [AR 1272, 1275] Nonetheless, both note mild cognitive impairment that needed monitoring. [*Id.*]

Records from July 2021 indicate that Plaintiff was doing well overall, but that he still had some anxiety symptoms throughout the day. [AR 1265] He is described as alert and oriented. [*Id.*] Records from August and October 2021 reflect stable moods and describe Plaintiff as alert and oriented. [AR 1259, 1263]

On March 25, 2022, Plaintiff attended a clinical appointment for a psychological evaluation.  [AR 1096]  He described his encephalitis diagnosis and explained that he had not been seen by a neurology specialist since that diagnosis.  [*Id.*]  Plaintiff was engaged and his interactions were appropriate for the situation.  [AR 1097]  His thinking was linear and logical and he appeared to have sound judgment.  [*Id.*]

On May 19, 2022, Plaintiff underwent a sleep medicine consultation with the Colorado Sleep Institute.  [AR 1112-14]  Plaintiff indicated that his sleep had been better since beginning Seroquel and clonazepam.  [AR 1114]  The Colorado Sleep Institute recommended that Plaintiff's oxygen saturations be checked while sleeping to determine if nocturnal hypoxemia could be an underlying cause of Plaintiff's insomnia. [*Id.*]

During a May 27, 2022 medical visit, Plaintiff reported having difficulty sleeping. [AR 1094]  Nonetheless, his mood was good and he denied delusions or hallucinations. [*Id.*]  He was alert and responded appropriately during the interview.  [*Id.*]  His thinking was linear and logical and his judgment appeared sound.  [*Id.*]

During a July 5, 2022 medical appointment, Plaintiff stated that his medications were "going well" and his mood was "good."  [AR 1090]  Plaintiff denied delusions or hallucinations.  [*Id.*]  Plaintiff was cooperative and his articulation was clear and understandable.  [*Id.*]  His thinking was linear and logical.  [*Id.*]

August 12, 2022 medical records indicate that Jessica Bennett, the Executive Director at the shelter where Plaintiff was staying, had concerns over Plaintiff's mental health.  [AR 1089]  According to the records, Ms. Bennett had noticed a "drastic decline" in Plaintiff's mental status which was "very concern[ing]."  [*Id.*]  Ms. Bennett indicated

that Plaintiff "gets lost in the parking lot at Walmart across the street, becomes confused and takes more of his meds [than] he should."  [*Id.*]

During a September 13, 2022 psychiatric appointment, Plaintiff indicated that he was "doing okay" and did not have any psychiatric symptoms.  [AR 1087]  His mood was good and he responded appropriately to questions.  [*Id.*]  Plaintiff's affect was stable and his speech was appropriate for the situation.  [*Id.*]

Medical records from October 28 indicate that things were "going okay" for Plaintiff and that he was not having psychiatric symptoms.  [AR 1085]  Plaintiff denied delusions or hallucinations.  [*Id.*]  Plaintiff was alert and responded appropriately to questions.  [*Id.*]  His affect was stable and his thought process was logical.  [*Id.*]

During a December 30, 2022 medical appointment, Plaintiff described his mood as good and indicated that things were going well with his medications.  [AR 1186]  Plaintiff denied delusions or hallucinations.  [*Id.*]  His speech was appropriate and his thought process was logical.  [*Id.*]

On November 22, 2023, Plaintiff was struck by a motor vehicle while walking across the street.  [AR 12]  The vehicle was travelling approximately ten to fifteen miles per hour at the time.  [*Id.*]  Plaintiff suffered a left tibial plateau fracture, a left hip contusion, an intracranial hemorrhage, and a C-spine injury.  [AR 36]  He needed surgery for the left tibia fracture.  [AR 15]  A CT of the head and C-spine were negative. [AR 43]  Plaintiff was still homeless at the time of the accident.  [AR 17]  He underwent occupational therapy while in the hospital and was eventually discharged on December 7, 2023.  [AR 63-424]

14

**B.    Opinion Evidence[9]**

On December 18, 2013, Plaintiff was evaluated by Adi A. Gerblich, M.D., an examining agency source.  [AR 809-15]  Dr. Gerblich's evaluation was primarily focused on Plaintiff's physical condition, but Dr. Gerblich did indicate that Plaintiff would need continuous follow-up treatment for his seizures and panic attacks.  [*Id.*]  Dr. Gerblich did not note any sedentary activity limitations.  [AR 811]

On March 26, 2014, Anna Grossman-McKee, Ph.D., provided a treatment summary concerning her treatment of Plaintiff.  [AR 817-18]  Dr. Grossman-McKee indicated that she began treating Plaintiff in October 2007 and Plaintiff had attended a total of 16 visits with Dr. Grossman-McKee.  [AR 817]  She stated that Plaintiff had been previously diagnosed with bipolar disorder I, bipolar disorder II, generalized anxiety disorder, and major depressive disorder, recurrent, moderate.  [*Id.*]  Dr. Grossman-McKee stated that Plaintiff had previously been prescribed a number of medications but, at that time, was taking Ambien, Seroquel, Klonopin, and Cymbalta.  [*Id.*]  She further stated that Plaintiff was working with his health care providers to assess the cause and course of treatment for seizures.  [*Id.*]  She recommended that Plaintiff be evaluated by a neurologist and neuropsychologist as she suspected possible impairment in Plaintiff's cognitive functioning.  [AR 818]  She further opined that Plaintiff's cognitive impairment, combined with his gastrointestinal and back problems, would impact his ability to work full time.  [*Id.*]

On February 20, 2018, Dorothy Bradford, M.D., an examining agency source, evaluated Plaintiff.  [AR 1008-13]  Dr. Bradford noted Plaintiff's 2001 hospitalization for

---

[9] Once again, the Court focuses on the opinion evidence related to Plaintiff's psychological issues and cognitive difficulties.

encephalitis and that, since that time, Plaintiff had trouble sleeping and suffered from anxiety and panic attacks.  [AR 1012]  Dr. Bradford also noted that Plaintiff has taken clonazepam, escitalopram, cyclobenzaprine, quetiapine, and oxcarbazepine.  [*Id.*]  She noted that Plaintiff was alert to person, place and time and concluded that there were no clinical neurological deficits from Plaintiff's encephalitis.  [AR 1013]

On July 20, 2020, Landrey Fagan, M.D., completed a Colorado Department of Human Services form.  [AR 1190]  Dr. Fagan indicated that Plaintiff suffered from neurological disorders, mental or cognitive disorders, psychophysiological insomnia, cognitive impairment, and panic attacks.  [*Id.*]  According to Dr. Fagan, Plaintiff had a total disability and was unable to work full time at any job.  [*Id.*]

On January 3, 2023, Andrea Szporn, Ph.D., performed a psychiatric records review.  [AR 482-83]  Dr. Szporn opined that Plaintiff had mild impairments in his ability to understand, remember, or apply information, and in his ability to concentrate, persist, or maintain pace.  [AR 483]  Dr. Szporn concluded that Plaintiff's mental impairments were non-severe.  [*Id.*]

On February 5, 2023, Mark Suyeishi, Psy.D., performed a psychiatric records review.  [AR 490-91, 497-98]  Like Dr. Szporn, Dr. Suyeishi concluded that Plaintiff did not suffer from a severe mental impairment.  [AR 490-91]  Dr. Suyeishi based his conclusion on an apparent lack of sufficient records.  [AR 498]

On June 28, 2023, Rebecca Shtulman, Ph.D., conducted a neuropsychological assessment.  [AR 1195-1203]  Dr. Shtulman noted that Plaintiff's speech was normal in tone but was laconic.  [AR 1198]  Plaintiff was alert and maintained adequate attention throughout testing.  [*Id.*]  Dr. Shtulman noted that Plaintiff appeared to have cognitive

deficits. [*Id.*] Overall, the neuropsychological evaluation revealed a pattern of both relative strengths and weaknesses. [AR 1200] Plaintiff's intellectual abilities were in the average range. [*Id.*] Plaintiff's scores reflected marked memory deficits with a variable pattern of dysfunction. [AR 1199-1200] Testing also reflected a weakness in executive functioning, though this too was variable with tasks. [AR 1200] According to Dr. Shtulman: "Taken together, [Plaintiff's] test results reflect[ed] significant cognitive weaknesses, and he appear[ed] to experience difficulty with some aspects of daily independent functioning as well, thus warranting a diagnosis of Major Neurocognitive Disorder." [*Id.* (emphasis omitted)] Dr. Shtulman further noted that Plaintiff's self-report mood inventory score was in the moderate-severe range for depression and in the moderate range for anxiety. [*Id.*] Based upon the evaluation, Dr. Shtulman recommended that Plaintiff receive ongoing support as he would likely struggle to live independently. [AR 1201]

### C.    Procedural History

Plaintiff's applications for DIB and SSI were initially denied on January 4, 2023. [AR 474, 479] Plaintiff requested reconsideration of this decision and on February 27, 2023, Plaintiff's applications were again denied. [AR 486, 493] On March 13, 2023, Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). [AR 523-24] A hearing was conducted before ALJ Erin Justice on September 26, 2023, at which Plaintiff, Ms. Bennett, and vocational expert ("VE") Daniel Best testified. [AR 453-73] Plaintiff was represented at the hearing by attorney Brendan Conley. [*See* AR 428]

On November 6, 2023, the ALJ issued a decision denying Plaintiff benefits. [AR 428-45] Plaintiff timely requested a review of that decision by the Appeals Council

which denied his request for review on April 22, 2024.  [AR 1-7]  Plaintiff timely filed an appeal with this Court on June 26, 2024.  [#1]  Because the Appeals Council denied Plaintiff's appeal, the ALJ's decision is the final decision of the Commissioner for purposes of this appeal.  *See* 20 C.F.R. §§ 404.981, 416.1481, 422.210.

### D.      The ALJ's Decision

The ALJ denied Plaintiff's applications for DIB and SSI after evaluating the evidence pursuant to the five-step sequential evaluation process.  [AR 428-40]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date.  [AR 430]  At step two, the ALJ found that Plaintiff had the following severe impairments: seizure disorder, degenerative disc disease, osteoarthritis of the right knee, depressive disorder, and anxiety disorder.  [AR 430-31]  At step three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations.  [AR 431-33]

Following step three, the ALJ determined that Plaintiff retained the RFC to perform "medium work" as defined in 20 C.F.R. § 404.1567(c) and 416.967(c), but with the following limitations:

> [Plaintiff] can occasionally lift 50 pounds and frequently lift 25 pounds.  He can stand and/or walk for a total of 6 hours and sit for 6 hours in an 8-hour day.  He can never climb ladders, ropes, and scaffolds.  He must avoid all exposure to unprotected heights and heavy machinery.  He can understand, remember, and perform simple work.  He cannot perform strict production pace work such as assembly and line work.  He can tolerate occasional changes in the workplace.

[AR 433-34]  The ALJ provided a narrative setting forth the evidence considered in determining the RFC and explaining the ALJ's consideration of the medical opinions in the record.  [AR 434-38]

At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work.  [AR 438]  Finally, at step five, the ALJ concluded that, considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.  [AR 438-39] Specifically, the ALJ agreed with the VE's testimony opining that Plaintiff could perform the following representative occupations:  bundle clerk, laundry worker, and automobile detailer.  [AR 439]  Accordingly, the ALJ determined that Plaintiff was not under a disability from January 1, 2014 through November 6, 2023 (the date of the ALJ's decision).  [AR 439-40]

## III.    ANALYSIS

Plaintiff raises a single challenge to the ALJ's decision, claiming that the ALJ erred at step three because she gave insufficient consideration to the Paragraph C criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00. [#11 at 12-18][10]  Plaintiff asks the Court to reverse the Commissioner's denial of benefits and remand for payment of benefits pursuant to 42 U.S.C. § 405(g).  [*Id.* at 19] The Court begins with an analysis of the ALJ's opinion then turns to Plaintiff's request for a remand for payment of benefits.

---

[10] For consistency and clarity, the Court refers to the actual page number of the .pdf document uploaded to the Electronic Court Filing system, rather than to the numbering printed on each page.

### A.    The ALJ's Step 3 Analysis

As noted above, at step three the Commissioner must determine whether any of the plaintiff's severe impairments meets or medically exceeds the severity of one of the listed impairments in the appendix of the regulations ("the Listings").  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Grogan*, 399 F.3d at 1261; *Bailey*, 250 F. Supp. 3d at 784.  To meet a Listing, the claimant's impairment must "satisf[y] all of the criteria of that listing, including any relevant criteria in the introduction, and meet[] the duration requirement."   20 C.F.R. § 416.925(c)(3).   The claimant bears the burden of demonstrating that her impairment meets or equals the requirements of a listed impairment, *Fischer-Ross v. Barnhart*, 431 F.3d 729, 732 (10th Cir. 2005), but it is nevertheless "the responsibility of the ALJ to articulate the specific reasons for finding that the listing has not been met, including a discussion of 'the uncontroverted evidence that supports the claimant's application for benefits, and the significantly probative evidence that he or she rejects,'" *Howarth v. Berryhill*, No. 3:16-CV-1844 (JCH), 2017 WL 6527432, at *8 (D. Conn. Dec. 21, 2017) (citation omitted)).  *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

According to Plaintiff, the ALJ failed to give adequate explanation for her conclusion that Plaintiff failed to satisfy Listing 12.02, neurocognitive disorders.  [#11 at 12-18]  Listing 12.02 contains three paragraphs.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.02.  To satisfy Listing 12.02, a claimant must satisfy the requirements of Paragraph A and the requirements of either Paragraph B or Paragraph C.  *Id.*

Plaintiff contends that the ALJ failed to adequately explain her conclusion that Plaintiff failed to satisfy the Paragraph C requirements.  [#11 at 12-18]  Paragraph C requires a claimant to show that:

> [The claimant's] mental disorder in this listing category is 'serious and persistent,' that is, [the claimant] ha[s] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> > 1.    Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms of [the claimant's] mental disorder (see 12.00G2b); and
> >
> > 2.    Marginal adjustment, that is, [the claimant] ha[s] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [the claimant's] daily life (see 12.00G2c).

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.02.

Here, in assessing Paragraph C, the ALJ stated:

> The undersigned has also considered whether the paragraph C criteria are satisfied.  In this case, the evidence fails to establish the presence of the paragraph C criteria.  The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life.

[AR 433]  Because the ALJ concluded that Plaintiff did not meet or equal a Listing, she was required to "discuss the evidence and explain why [s]he found that [Plaintiff] was not disabled at step three."  *Clifton*, 79 F.3d at 1009.  The ALJ's conclusory statement— which merely parrots the standard for determining marginal adjustment—fails to satisfy this requirement; it simply does not enable the Court to "assess whether relevant evidence adequately supports the ALJ's conclusion that [Plaintiff's] impairments did not meet or equal" Listing 12.02, and thus fails to satisfy the ALJ's obligations at Step 3.  *Id*.

The Commissioner nonetheless argues that the ALJ's analysis was sufficient once the Court considers other portions of the ALJ's opinion.  [#12 at 9-11]  The Commissioner points to the ALJ's conclusion that Plaintiff had only moderate limitations in adapting and managing himself and her conclusion that Plaintiff had a significant reduction in symptoms with medication.  [*Id.* at 9-10]  According to the Commissioner, evidentiary support exists for these conclusions and the fact that this Court may have reached a different conclusion does not justify reversal.  [*Id.* at 10-11]

"[I]nadequate analysis at step three may constitute harmless error if the 'ALJ's findings at other steps of the sequential process [] provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment.'"  *Hawkins v. Colvin*, No. 2:13-cv-00980-EJF, 2015 WL 1481150, at *8 (D. Utah Mar. 31, 2015) (quoting *Fischer-Ross*, 431 F.3d at 733).  An ALJ's error is harmless when the court finds that in light of the evidence that the ALJ considered, "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way."  *Fischer-Ross*, 431 F.3d at 733-34 (quoting *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004)).

Here, the Court cannot opine that no reasonable factfinder could conclude that Plaintiff has a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  Indeed, Ms. Bennett's testimony at the administrative hearing would support such a conclusion.  The ALJ detailed the testimony of Ms. Bennett as follows:

> Ms. Bennett reported that she interacts with the claimant two to three times per week.  Ms. Bennett indicated that the claimant has cognitive problems and described instances where he has been unable to perform simple activities such as organizing a pantry.  She discussed episodes

> where the claimant became distracted while washing dishes and walked away with the water still running.  Ms. Bennett also recounted an episode where the claimant got lost and a history of losing about 10 mobile phones.  Ms. Bennett further indicated that the claimant struggles to remember to take his medications.

[AR 434]  The ALJ does not appear to question this testimony[11] yet fails to analyze how this testimony does or does not support a conclusion that Plaintiff has only a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  Similarly, the ALJ acknowledged that Plaintiff's "records confirm a long history of mental health impairments, including a remote (2001) history of hospital admission for psychosis" [AR 435] but does not explain why such records and periods of decompensation do not support a conclusion that Plaintiff has only a minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life.  The closest the ALJ comes to an explanation is her statements that Plaintiff's conditions "appear[] to improve when properly medicated" [AR 436-37] and "the evidence show[s] benign mental status findings when [Plaintiff] has been in a stable situation and properly medicated" [AR 438], but these statements still fail to account for (or otherwise address) Ms. Bennett's testimony that Plaintiff struggles to take such medications because he cannot recall the days of the week or whether he had taken his medications for the day [AR 468] and the fact that Plaintiff was homeless (and thus not in a stable situation) at the time of the hearing [AR 458].

In *Gonzalez v. Commissioner of Social Security*, the court found the ALJ's conclusory statement, that "[t]here [wa]s no medical evidence or testimony" that plaintiff

---

[11] The ALJ states that "*the claimant's* statements concerning the intensity persistence and limiting effects of these symptoms are not entirely consistent with the [record]," but does not appear to question in any way Ms. Bennett's testimony.  [AR 434 (emphasis added)]

satisfied Paragraph C, to be inadequate.  No. 16 Civ. 8445 (KMK) (PED), 2017 WL 7310391 (S.D.N.Y. Dec. 21, 2017), at *10 (citation omitted), *report and recommendation adopted*, 2018 WL 671261 (S.D.N.Y. Jan. 31, 2018).  The court explained that the ALJ had ignored evidence of the plaintiff suffering repeated episodes of decompensation, "including withdrawal [fr]om situations, poor decision making, inability to appropriately accept supervision, . . . deterioration from previous levels of functioning, . . . and inability to adapt to changing demands of context."  *Id.*  "While this evidence d[id] not conclusively demonstrate" that plaintiff met Paragraph C, it was "unclear [fr]om the face of the decision whether the ALJ even considered" that evidence, and thus the court held that the ALJ had not "offered a meaningful analysis of the Paragraph C criteria."  *Id.* at *11.

As in *Gonzalez*, it is possible that the evidence supports the ALJ's conclusion that Plaintiff cannot satisfy the Paragraph C criteria.  But "this [C]ourt will not undertake a post hoc effort to justify the ALJ's conclusions.  To do so would 'overstep [the Court's] institutional role and usurp essential functions committed in the first instance to the administrative process.'"  *O'dell v. Colvin*, No. 1:15-cv-00628-CBS, 2016 WL 5395247, at *5 (D. Colo. Sept. 27, 2016) (quoting *Robinson v. Barnhart*, 366 F.3d 1078, 1084-85 (10th Cir. 2004))).  Accordingly, the Court is unable to determine whether the ALJ's Paragraph C conclusion is supported by substantial evidence, which is reversible error.  *See Lawrence v. Colvin*, No. 14-cv-00812-KMT, 2015 WL 5579432, at *4-5 (D. Colo. Sept. 23, 2015).

### B.    Plaintiff's Request for Remand with an Immediate Award of Benefits

Plaintiff requests that the case be remanded to the Commissioner for an immediate award of benefits.  [#11 at 19]  "Outright reversal and remand for immediate

award of benefits is appropriate when additional fact finding would serve no useful purpose." *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989) (quotation omitted). Where, as here, "the record on appeal is unclear as to whether the ALJ applied the appropriate standard by considering all the evidence before [her], the proper remedy is reversal and remand." *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). The Court thus declines Plaintiff's request to remand with an instruction for an immediate award of benefits.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, the Court **REVERSES** the Commissioner's decision that Plaintiff was not under a disability within the meaning of the SSA from January 1, 2014 through November 6, 2023 and **REMANDS** this matter to the Commissioner for rehearing and reconsideration consistent with this Order.

DATED:  April 16, 2025              BY THE COURT:

                                   s/Scott T. Varholak
                                   Chief United States Magistrate Judge